ROWAN et al. v. TEXAS ORCHARD DEVELOPMENT CO. et al. (No. 6632.)*

(Court of Civil Appeals of Texas. Galveston. June 12, 1915. On Motion for Rehearing, Jan. 6, 1916.)

1. CORPORATIONS ⊜⟶82—PREFERRED STOCK—REDEMPTION FROM CAPITAL—VALIDITY OF AGREEMENT.

A preferred stockholder's rights are ordinarily superior to those of a holder of common stock only in that he is entitled to have his dividends paid before any dividends are paid on the common stock, and an agreement to redeem preferred stock out of the capital, if there are no profits, will not be enforced.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 285–295; Dec. Dig. ⊜⟶82.]

2. CORPORATIONS ⊜⟶82—PREFERRED STOCK — REDEMPTION FROM CAPITAL — VALIDITY OF AGREEMENT.

Where prior to the organization of a corporation to which land was contracted to be conveyed, a vendor's lien being retained for the unpaid purchase money, the vendors had agreed that the purchasers of preferred stock of the corporation should be given the right to have the stock redeemed in land, and where the corporation took title with knowledge of this agreement and expressly agreed to be bound by it, the corporation could not defeat the enforcement of the contract on the ground that it is against public policy for a corporation to redeem its stock out of its capital, especially where the only actual capital of the corporation was the money paid for the preferred stock, and the land, which never exceeded in value the incumbrance on it, never became a part thereof, though a portion of the money received by the corporation for the preferred stock was paid to the vendors as part of the purchase price, and under such circumstances the land bought would ordinarily become part of the corporation capital.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 285–295; Dec. Dig. ⊜⟶82.]

3. CORPORATIONS ⊜⟶82—STOCK—AGREEMENT TO PURCHASE—RIGHT TO ENFORCE.

A corporation's agreement to buy its stock from a stockholder will be enforced, when the purchase can be made and the stock paid for, without prejudice to the rights of creditors and other stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 285–295; Dec. Dig. ⊜⟶82.]

4. CORPORATIONS ⊜⟶376—POWERS—PURCHASE OF LAND—PAYMENT IN STOCK—REDEMPTION.

A corporation organized to sell land which represents its capital and for which corporate stock was issued, may provide in its charter that the holders of the stock may surrender it and accept land in lieu thereof on such terms as may be determined by the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1530; Dec. Dig. ⊜⟶376.]

5. TRUSTS ⊜⟶171—DEED OF TRUST—POWERS OF TRUSTEE — SALE OF LAND — REDEMPTION OF PREFERRED STOCK.

A deed of trust, giving the trustees "full power to manage * * * land * * * to improve, lease, or sell the whole or any part thereof on such terms * * * as may seem best * * * and also * * * full power to organize a corporation * * * and convey said estate thereto," authorized the trustees to organize a corporation to develop and sell the land and to do all things necessarily incidental thereto, including the execution of an agreement giving purchasers of preferred stock of the corporation a right to demand redemption of same in land.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 226; Dec. Dig. ⊜⟶171.]

6. ESTOPPEL ⊜⟶92 — ACCEPTANCE OF BENEFITS—UNAUTHORIZED CONTRACT.

Where persons who have contracted to transfer land to a corporation organized to develop and sell same accept in part payment therefor, with knowledge of the agreement to redeem, part of the proceeds of a sale of preferred stock of the corporation, sold under an agreement entitling the purchasers to demand redemption in land, they are estopped to claim that the agreement was unauthorized because originally made by trustees having no power to make same.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 260–263, Dec. Dig. ⊜⟶92.]

7. VENDOR AND PURCHASER ⊜⟶89—VENDOR'S LIEN—FORECLOSURE—RIGHTS OF THIRD PERSON.

Where it appeared that the rights of third persons could be protected only by restricting to their remedy of foreclosure persons who had retained a vendor's lien on land which they had contracted to transfer to a corporation organized to develop and sell the land, the court properly refused to declare a forfeiture of the executory contract for default in payment of the purchase money by the corporation.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 148, 149, 151, 156; Dec. Dig. ⊜⟶89.]

8. VENDOR AND PURCHASER ⊜⟶98—CONTRACT TO CONVEY—RIGHT TO RESCIND—RESTORATION OF BENEFITS RECEIVED.

Where persons who had agreed to convey land to a corporation organized to develop and sell same received in part consideration therefor the proceeds of the sale of preferred stock sold under an agreement entitling the buyers to demand redemption of same in land, they could not rescind the contract to convey without offering to return to such buyers that which they had received from them.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 163–165; Dec. Dig. ⊜⟶98.]

9. MORTGAGES ⊜⟶200—DEED OF TRUST—TAXES PAID BY GRANTEE—LIABILITY OF GRANTOR.

That the grantors in a deed of trust given to secure an indebtedness paid taxes due on the land to a corporation organized to develop and sell the land did not relieve them from liability under the deed of trust to the grantee therein for taxes paid by him.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 526–531; Dec. Dig. ⊜⟶200.]

10. VENDOR AND PURCHASER ⊜⟶292 — VENDOR'S LIEN NOTES—PERSON PAYING INTEREST—CONTRACT RIGHT TO REIMBURSEMENT.

Where an agreement between the parties interested in a transaction in which it was agreed that land should be conveyed to a corporation organized to develop and sell same, a vendor's lien being retained by the grantors, specified

"that the funds created to discharge the vendor's lien notes * * * and the accrued interest thereon shall be applied to payment of any * * * interest accrued * * * and if any * * * interest be paid out of other funds or be advanced by other parties, collections thereafter made for the benefit of said funds shall be applied * * * to repay said advancements," a person who had a lien on the property, and advanced money to pay interest on the vendor's lien notes, was entitled to be repaid the amount thereof out of the proceeds of the land before payment of the notes.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 826–828; Dec. Dig. ⬤⟿292.]

11. CORPORATIONS ⬤⟿82—PREFERRED STOCK— AGREEMENT TO REDEEM—ACCRUAL OF RIGHT.

Where a corporation, organized to develop and sell land to be conveyed to it, a vendor's lien being retained, became insolvent and in proceedings to wind up its affairs it became necessary to sell the land to satisfy claims and the vendors obtained an order of sale to satisfy the debt due them, the purchasers of preferred stock, under an agreement giving them a right superior to the rights of the vendors to demand redemption of the stock in land on a certain date, were entitled to demand such redemption, though that date had not arrived.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 285–295; Dec. Dig. ⬤⟿82.]

12. CORPORATIONS ⬤⟿232—INSOLVENCY—LIABILITY OF STOCKHOLDERS—DEBTS DUE UNSECURED CREDITORS.

Under Const. art. 12, § 6, providing that no corporation shall issue stock except for money paid, labor done, or property actually received, and Rev. St. 1911, art. 1146, prohibiting watering stock, and article 1198, providing when and how stockholders may be made liable, stockholders were liable for an amount sufficient to pay unsecured creditors of the insolvent corporation, where it appeared that the stock was issued to them without any money or thing of value having been received therefor by the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. ⬤⟿232.]

13. CORPORATIONS ⬤⟿232—INSOLVENCY—LIABILITY OF STOCKHOLDERS.

A judgment that two stockholders, shown to have paid nothing for their stock, should pay the whole amount necessary to satisfy the indebtedness of the corporation to unsecured creditors was erroneous, where it appeared that other stockholders had received a large amount of stock for which nothing was paid; each of such stockholders being liable on the stock issued to him only for his proportionate part of the debts due the unsecured creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. ⬤⟿232.]

Appeal from District Court, Harris County; Hon. Norman G. Kittrell, Special Judge.

Action by Lewis E. Gordon against the Texas Orchard Development Company, D. Noble Rowan, and others. From the judgment, defendant Rowan and others appeal. Reformed and affirmed, and rehearing denied.

Bryan & Bryan, G. H. Pendarvis, and Andrews, Streetman, Burns & Logue, all of Houston, for appellants. A. T. Carleton, Baker, Botts, Parker & Garwood, and Hunt, Myer & Teagle, all of Houston, for appellee. Bryan & Bryan, of Houston, for appellees Gordon and Keeney.

PLEASANTS, C. J. It is only necessary, for an understanding of this appeal, to state briefly the origin of this suit and the issues involved as disclosed by the pleadings.

The original petition was filed by plaintiff Lewis E. Gordon on December 14, 1911, against Texas Orchard Development Company, a corporation, D. Noble Rowan, Archibald H. Rowan, Southern Trust Company, and George E. Keeney. The plaintiff alleged that he was the owner of 100 shares of preferred stock in the orchard company of the par value of $100 per share, and that by the terms of an agreement entered into by the defendants he was entitled to have said stock redeemed from the proceeds of the sale of lands of the orchard company, or in lands of said company at a valuation of $27 per acre. It is alleged that, under the construction placed upon said agreement by the trust company, the trustee charged with its execution, it is impossible for the orchard company to continue its business of selling its lands and thereby meet its obligations to its creditors and the holders of its preferred stock. The appointment of a receiver for said company is prayed for, and the court is asked to construe the agreement before mentioned, and that the plaintiff and other holders of preferred stock of the company be adjudged the right to have said stock redeemed in lands of the company at the valuation of $27 per acre. On the day this petition was filed, the defendant orchard company having accepted service and entered an appearance, a receiver was appointed.

The plaintiff, on May 6, 1912, filed a first supplemental petition, amplifying the grounds contained in his original petition, and praying for the redemption of said $10,000 of preferred stock in the Texas Orchard Development Company held by him, and on September 10, 1912, a first amended original petition, with the same parties as defendants, and also against D. Noble Rowan and Archibald Rowan, individually, and against Margaret H. Rowan, Alice Rowan, Jeanne Rowan, Mrs. Lillian Rowan, reiterating and enlarging the grounds for relief set out in preceding pleadings, and praying for redemption in some form of said preferred stock. On May 6, 1912, Raymond G. Keeney filed his original petition in intervention, alleging his ownership of 900 shares of the preferred stock of said Texas Orchard Development Company, of the par value of $90,000, and praying for the redemption of the same upon the same grounds as prayed for by the plaintiff. On June 7, 1912, defendant George E. Keeney filed his first amended original answer and cross-bill, in which he claimed the ownership of certain indebtedness against the defendants and Rowan and the Texas Orchard Development Company, said indebtedness being: (1) Certain notes aggregating about $55,000 principal, alleged to be secured

by a first lien under a deed of trust against the lands owned by the Texas Orchard Development Company; (2) indebtedness of $6,136.71, alleged to have been advanced by him to pay interest on the indebtedness of the Texas Orchard Development Company to the Rowans, trustees; (3) an indebtedness of about $4,400, alleged to have been paid by him as taxes upon the lands of said orchard company; (4) an indebtedness of $26,488.31 for money loaned by said defendant to said orchard company. The same causes of action were reiterated, and the grounds of relief amplified, in said defendant George E. Keeney's second amended original answer and cross-bill filed February 3, 1913. At various dates, pending the litigation, interventions were filed by numerous creditors of the orchard company. On June 9, 1913, the receiver, on behalf of all such unsecured creditors, filed a plea of intervention, setting out the existence of such unsecured debts, the alleged unlawful character of the organization of the Texas Orchard Development Company in the matter of subscription to and payment for stock, and praying for a preference out of the proceeds of the sales of lands of the company in favor of said unsecured creditors as against the other parties to the suit. The defendants D. Noble Rowan and Archibald H. Rowan, as trustees, filed their original answer and cross-bill on June 9, 1913. In this pleading they asserted various defenses to the cause of action asserted by plaintiff, and by their cross-bill sought to recover back the lands involved in this controversy, or, in the alternative, a foreclosure of a vendor's lien on said land to secure the payment of purchase-money notes of the orchard company in the sum of $555,170.79.

From the foregoing pleadings the issues presented were briefly the following: (1) The right of the holders of preferred stock of the Texas Orchard Development Company to have said stock redeemed, that is, to have repaid to such holders of said preferred stock, in land or money, the amount paid by them to said corporation on their subscriptions for said stock, (2) the right of the defendant George E. Keeney and the intervening creditors to judgments for the various indebtedness alleged by them; (3) the right of the defendants Rowan as trustees to judgment for the lands conveyed to the Texas Orchard Development Company, or, in the alternative, judgment with foreclosure upon the vendor's lien notes executed to them for the purchase money of said lands; (4) the adjustment of the priorities between the holders of such of said indebtedness as should be found to be valid.

The trial was had before the district judge, without a jury. Findings of fact and conclusions of law were filed, covering about 100 pages in the transcript. Judgment was entered August 12, 1913. By the judgment the claims of the various parties were established, the lands of the Texas Orchard Development Company were ordered sold, and the proceeds directed to be applied as follows: (1) To the costs and expenses of the receivership, (2) to the defendant George E. Keeney the sum of $71,374.74; (3) to the defendants D. Noble Rowan and Archibald H. Rowan, as trustees, the sum of $647,329.11, principal and interest, and the sum of $67,302.45 attorneys' fees upon their vendor's lien notes. It being provided, however, that $151,000 of said amount should be paid into the registry of the court to be held for the redemption of the preferred stock of the plaintiff Gordon and intervener Raymond G. Keeney, and the defendant A. H. Rowan, unless said land should be sold subject to the right of said preferred stock to be redeemed in land, thereby giving the preferred stock and the accumulated dividends thereon the preference over said vendor's lien notes; (4) it was provided that out of said sum of $151,000 decreed to be paid to the holders of said preferred stock the unsecured creditors should be paid; (5) the order of sale was stayed by order of the court until the final disposition of this cause upon appeal. From this judgment the defendants D. Noble Rowan and Archibald H. Rowan, as trustees and individually, and the other defendants Rowan, have appealed. The defendants Gordon and George E. Keeney have also appealed from a portion of the judgment.

The material facts disclosed by the record are as follows: The land involved consists of about 25,000 acres of land in Brazoria county, Tex. Prior to August 1, 1907, said lands were the separate property of Mrs. Margaret H. Rowan, wife of appellant D. Noble Rowan. On August 1, 1907, said Margaret H. Rowan, the owner of said lands as her separate property, joined by other members of her family, executed a deed in trust to D. Noble Rowan, her husband, and George W. Rowan and Archibald H. Rowan, her sons, as trustees. After the granting and descriptive clauses, said deed contained the following language:

"To have and to hold all and singular the above described and conveyed premises and property, with all the rights, privileges, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, unto the said D. Noble Rowan, George W. Rowan and Archibald H. Rowan, as such trustees, the survivors or survivor, successor or successors, or appointees, the parties of the second part or assigns, with full power to said trustees to manage said land and estate, to improve, lease or sell the whole or any part thereof upon such terms and conditions as may seem best to said trustees, or the acting trustee; and also with power to organize a corporation under the laws of such state of the United States of America or other country as such trustees or the acting trustee may deem best, and convey said estate thereto.

"The said D. Noble Rowan, as acting trustee, shall have power during his lifetime to act alone in all things pertaining to said estate, without the other trustees joining with him, with the same validity and effect as if he was the sole trustee, or as if all of said trustees had joined

with him. The. foregoing trust is made and accepted by the trustees upon condition that such trust shall continue during the lives of the said Margaret H. Rowan and D. Noble Rowan, and upon their death or consent prior thereto the said estate or the proceeds thereof in whatever condition or wherever situated, whether as land, shares or personalty, shall be equally divided between or paid to George H. Rowan, Alice Rowan, Margaret H. Rowan, Archibald H. Rowan and Jeanne L. Rowan, children of the said Margaret H. Rowan and D. Noble Rowan, share and share alike.

"In case of the death of either of said children before the termination of said trust, the heirs at law of said child shall receive the share its parents would have taken if living.

"During the life of said Margaret H. Rowan the income from said property shall be paid to her, and in the case the income shall not be sufficient for her wants, then, at her request, any part of the principal can be converted and paid to her.

"It is also a condition of this trust that in case my husband, D. Noble Rowan, shall survive me, that so much of the income from said property as he shall deem necessary for his support and comfort during his natural life, not to exceed one-half of said income, shall be paid to him for that purpose; or a portion of said property shall be sold and invested, and the income applied to such purpose, but in no case shall any part of said income be diverted from him to pay any of his creditors, and he may decline to avail himself of such income. It is also a condition that at the request of the said Margaret H. Rowan and D. Noble Rowan the said trustees shall divide the said estate or any portion of it between the said children in equal proportions; conditioned also that upon the death of either of the said trustees, the survivors, with the written consent of the said Margaret H. Rowan, can appoint a substitute trustee in place of the one deceased.

"The parties of the first part, for themselves, their heirs, administrators and assigns, do hereby warrant and forever defend all and singular the said premises unto the said parties of the second part, their successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof."

Said deed in trust was filed for record in Brazoria county, Tex., December 18, 1908, and duly recorded in the deed records of that county. All parties at interest had actual and constructive notice of said deed in trust and the terms and limitations therein prescribed, with reference to the powers of the trustees.

Mrs. Margaret Rowan, wife of D. Noble Rowan, died January 18, 1908. Her husband, D. Noble Rowan, and the five children named in the foregoing deed of trust, survived her. George W. Rowan, one of the children and one of the trustees named in said deed of trust, died February, 1911. He left surviving him a wife, Lillian Rowan, defendant herein, but no children. The other four children named in said deed of trust are still living, and all unmarried. Prior to the execution of the foregoing deed in trust Mrs. Margaret H. Rowan, joined by her husband and her son George W. Rowan (November 26, 1904) had executed a deed of trust to the Houston Land & Trust Company on said lands, to secure 11 notes, aggregating $50,000. On November 26, 1908, a second deed of trust to the Houston Land & Trust Company was executed covering said land, by D. Noble Rowan, trustee, George H. Rowan, trustee, George W. Rowan, Archibald H. Rowan, trustee, and Archibald H., Alice, and Margaret H. Rowan individually. This second deed of trust was given to secure interest already due and secured by the first deed of trust, and also for money advanced to pay taxes then due upon the property, which were, of course, a first lien upon the same. These notes, aggregating $55,000, are the notes on which judgment was recovered on the cross-bill of defendant George H. Keeney. In August, 1910, appellant D. Noble Rowan, acting in his capacity as trustee under the deed of trust above mentioned, entered into a contract with D. L. Robertson of Glens Falls, N. Y., and E. H. Kent, a real estate agent of Houston, looking to the formation of a corporation for the improvement and sale of said lands. This agreement was never consummated in exact accordance with its terms. So far as it has any bearing upon the issues raised by this appeal it is only necessary to state that this agreement by its terms provided for the survey of the land and its conveyance to the proposed corporation at a valuation of $27 per acre. The proposed corporation was to have a capital stock of $1,000,000, $100,000 of which was to be preferred stock and bear interest at the rate of 7 per cent. per annum. The first payment of the purchase money for the land, $35,000, was to be made out of the proceeds of the sale of the preferred stock, and the remainder of the purchase money was to be evidenced by note secured by vendor's lien upon the land. $700,000 of the common stock of the corporation was to be transferred to Robertson and Kent for underwriting the preferred stock and to the subscribers for said stock. The remainder of the common stock was to go to the Rowan trustees in consideration of the low price at which the land was to be sold to the corporation and the favorable terms of payment therefor. There was no provision in this contract for the redemption of the preferred stock. In August, 1910, Mr. Robertson, who with E. H. Kent had the contract, as above stated, went to Hartford, Conn., and undertook to interest George E. Keeney in the purchase and sale of said Rowan lands. Robertson finally dropped out of the matter altogether, after, however, having brought together Kent, D. Noble Rowan, and George E. Keeney, and other Hartford parties connected with this lawsuit. The matter was considered by them at intervals for some time at Hartford, Conn., and early in October, 1910, the parties came to Houston, inspected the land, and thereafter entered into the first formal agreement with reference to said transaction. This agreement bore date August 20, 1910, but was in fact executed, as stated in October, 1910. It is signed by D. Noble Rowan, George W. Rowan, and Archibald H. Rowan,

as trustees, parties of the first part, and by George E. Keeney and Edgar C. Linn, parties of the second part.

The material provisions of this contract are as follows: It contains a recital of the powers of the trustees as set out in the deed in trust before mentioned, and refers to said trust deed for description of the land, and reserves from the agreement 1,000 acres of said lands. Fixes the value of the land at $27 per acre, and provides for its conveyance to the corporation. The purchase price of the land was to be paid, $25,000 in cash, and $20,000 or $30,000 in preferred stock of the corporation, the balance, $765,000 more or less, to be payable on or before 10 years, and evidenced by vendor's lien notes bearing interest at 3 per cent. per annum and secured by vendor's lien. Provides that the capital of the corporation shall be $1,500,000, and that it shall be organized under the laws of the state of Connecticut. Provides also as follows:

"There shall be $125,000.00 of preferred shares, which shall draw 7% cumulative dividends, and $1,375,000.00 in common shares. The preferred shares are to be sold at par, the proceeds of which are to be paid into the company's treasury. $900,000, more or less, of said common shares are to be transferred to said parties of the second part in consideration of their underwriting $100,000.00 of said preferred shares at par. $680,000.00 more or less, of said common shares is to go to George E. Keeney for securing subscription for $100,000.00 of the preferred stock, and $220,000.00, more or less, to Edgar C. Linn. $425,000.00, more or less, of said common stock is to be issued to said party of the first part in consideration of the easy terms of payment of said party of the first part."

That the business between the parties to the contract and the corporation to be formed should be transacted through the Houston Land & Trust Company, or some other trust company to be agreed upon. That such trustee should receive all moneys on sales of land, and disburse the same according to an agreement to be executed between the parties. Also provides as follows:

"All taxes, charges and liens against said lands are to be paid in full by the party of the first part up to the date of this contract, excepting the $55,000.00 lien held by the Houston Land & Trust Company shall be paid as herein provided for."

Also provided for releases in case of partial sales, and provided for the collection of the vendor's lien notes by the trust company to be agreed upon as trustee for the parties. Provided for a minimum selling price of all lands to be not less than the amount of the vendor's lien notes, with interest thereon, and for a division of the lands into three classes. Provided, further, as follows:

"Forty-five per cent. of the cash received on all contracts or conveyances in relation to said lands sold by said corporation is to be put to the account of the party of the first part by said trust company, and applied on the corporation's indebtedness, and ten per cent. of said receipts shall be paid into a sinking fund to retire the company's preferred stock, and any time after three years from date of organization of the company said preferred stock may be retired and called in in such manner as the board of directors may determine, and paid for from the said ten per cent. sinking fund. The balance of forty-five per cent. is to be paid into the treasury of the company in accordance with the provisions of said triparty agreement, which agreement shall also provide for a sinking fund out of the proceeds of the forty-five per cent. owing to the party of the first part to pay off an incumbrance of $55,000.00 and interest thereon, to the said Houston Land & Trust Company, without prejudice to the party of the first part, receiving interest at three per cent. as agreed upon."

Provided for the furnishing of $50,000 under circumstances which never happened, and is therefore immaterial. Authorized the trustees to subscribe and take $20,000 or $30,000 of the preferred shares on the same terms as other purchasers, and pay for same by credit on the purchase money. Provided for payment of interest on the vendor's lien notes out of the 45 per cent. sinking fund provided for that purpose. Also contained the following provision:

"This agreement made between the parties hereto and the triparty agreement to be made by the parties thereto and the said trust company shall provide that the $55,000.00 lien held by the Houston Land & Trust Company and the interest thereon shall be assumed and paid by the said corporation to be formed, as part of the purchase money instead of that amount in notes. Party of the first part will accept the interest to become due on said preferred vendor's lien notes of sales as made in lieu of the semiannual payments, as provided in said vendor's lien notes, provided the interest is paid semiannually as aforesaid. This clause, so far as it relates to the said $55,000 and interest, is subject to the approval of the Houston Land & Trust Company. It is also understood and agreed that the said corporation is to proceed immediately and make the best endeavors to sell said land to meet the spirit of this agreement."

"It is understood and agreed between the parties hereto and with the subscribers, or each of them who may take and pay for the said preferred shares, that after three years from the date of the conveyance to said corporation, and before five years from such date, they may turn over the shares and rights which they may have received under this contract to the party of the first part for the said corporation, and in lieu thereof receive a warranty deed to a part of said land, free of all incumbrances, and unimproved, of an average quality of the whole acreage conveyed and sufficient at $27 per acre to pay back the amount of such subscription, aggregating a total of $125,000.00, and not in excess of the entire preferred stock of the company, provided that notice of the right to take advantage of this provision shall be given to the company by the subscriber sixty days before the expiration of five years. Said party of the first part further agrees that he will insert a provision in the conveyance to be made to said corporation, providing that he will comply with this provision, such conveyance to give title to said lands, free from all incumbrance to said parties by warranty deed, and any of the 5,000 acres more or less reserved to be so conveyed. [This last clause evidently refers to some understanding which is not expressed as to the reservation of a certain part of the land to cover this agreement.] The party of the first part or the company may purchase this land at $27 per acre, and the proceeds of such purchase shall be used to pay for such stock if the party of the first part or the company so select. It is further agreed that if, prior to such time, or if at such time, the

said property shall for any reason on account of the default of such corporation, come back to the party of the first part, that the party of the first part will make good to said subscribers a title to said land upon their complying with their part of this clause, entitling them to such exchange by a retransfer to the party of the first part of such shares. In case of the party desiring to make such exchange, and the said corporation cannot agree upon the selection of the piece of land, or in case the party of the first part is substituted in place of the said corporation, each of said parties shall select an umpire who will make a final selection. Said party of the first part or said corporation, as interest may appear, may, instead of deeding said land to said preferred shareholders, paid said shareholders the par value of said preferred shares in money."

It also provided that the contract was to become effective unless the party of the second part gave notice to the contrary by wire prior to October 22, 1910. It was further agreed that the company was to be organized on or before November 15, 1910, and the cash payment of $25,000 and the deed to the property turned over to the corporation as above provided.

The parties having returned to Hartford, Conn., the Texas Orchard Development Company came into existence as a corporation. The incorporators were Edward M. Day, an attorney, and a stenographer and clerk in his office. It was incorporated as a Connecticut corporation. It had almost unlimited powers under its charter, the only powers which could be authorized under the corporation laws of Texas being paragraph 2, as follows:

"The purchase, sale and subdivision of real property in towns, cities and villages and their suburbs not extending more than two miles beyond their limits, and for the accumulation and loaning of money for that purpose."

The fourth paragraph of the charter is as follows:

"That the amount of capital stock of said corporation hereby authorized is $1,500,000.00, divided into 15,000 shares of the par value of $100.00 each, which stock shall be divided into classes as follows: 1,250 shares thereof shall be preferred stock, and 13,750 shares shall be common stock. The holders of the preferred stock shall be entitled to cumulative dividends thereon at the rate of seven per cent. for each fiscal year of the company and no more, payable out of any and all surplus or net profits quarterly, half yearly, or yearly, when declared by the board of directors; and in addition thereto, in the event of the dissolution or liquidation of the corporation, or a sale of all its assets, the holders of the preferred stock shall be entitled to receive the par value of their preferred shares, and all accumulated dividends out of the assets of the corporation, before anything shall be paid therefrom to the holders of the common stock. Said preferred stock at any time after three years from the time of its issue may be redeemed and discharged at the price of $100 for each share, together with all accrued dividends thereon, in such manner and upon such notice as the directors may determine. And said corporation may, and upon request made in writing by any or all of the holders of said preferred stock upon sixty days' notice at any time after three years and before five years from the date of its issue, shall redeem in cash in the way above provided the preferred stock of those making such request, or shall in lieu thereof redeem the same by conveying to such holders thereof by warranty deed free of all incumbrances unimproved land of an average quality of the whole that may be owned by said corporation at the time of such request at the rate of $27 per acre, to an amount equal to the par value of said preferred stock and all accumulated dividends thereon, in such manner and form as the by-laws of said corporation or the directors thereof may provide."

By-laws were passed for the corporation, and contained the following provisions:

"The directors shall have the right at any time after three years from the time of the issuing of the preferred stock, upon thirty days' notice, to call in and discharge any or all of the same for $100.00 a share and all cumulative dividends thereon, in such manner and upon such notice as the directors may determine. And said corporation may, and upon request made in writing by any or all of the holders of said preferred stock upon sixty days' notice at any time after three years and before five years from the date of its issue, shall, redeem in cash in the way above provided the preferred stock of those making such request, or shall in lieu thereof redeem the same by conveying to such holders thereof by warranty deed, free of all incumbrances, unimproved lands of the average quality of the whole that may be owned by said corporation at the time of such request, at the rate of $27.00 per acre to an amount equal to the par value of said preferred stock' and all accumulated dividends thereon, in such manner and form as the by-laws of said corporation or the directors thereof may provide. In case the holders of said preferred stock desiring to make such exchange, and said corporation cannot agree upon lands to be exchanged, an umpire shall be appointed by the parties, who shall make the final selection. The directors shall have the right to create a sinking fund out of any moneys received by the corporation to provide for the redemption of said preferred stock as hereinbefore set forth."

After the incorporation of the Texas Orchard Development Company, the parties formulated an agreement which bears date November 18, 1910, but which was not finally signed by all the parties until some time in April, 1911. It is called the "Four-Party Agreement."

The following is a summary of this agreement, with copies of those portions having most material bearing upon the questions presented: The parties executing the same were D. Noble Rowan and Archibald H. Rowan, as trustees under the deed in trust above mentioned (express reference to the same and its record being made), as parties of the first part, the Texas Orchard Development Company, party of the second part, Southern Trust Company of Houston, party of the third part, and George E. Keeney, party of the fourth part. The preamble recites the agreement of August 20th above set out, and the organization of the Texas Orchard Development Company. The preamble also contains the following:

"Whereas, said lands are to be conveyed to the Texas Orchard Development Company, the party of the second part herein, subject to a deed of trust securing the payment of a note or notes for $55,000.00 and interest thereon from November 26, 1910, which note or notes are hereby assumed by said party of the second part, and which shall be paid by said party of the third part as hereinafter provided; and whereas, the purchase price to be paid to the parties of the first part by the party of the second part for said lands is to be as follows: The assumption of the note or notes for $55,000, and interest thereon

from November 26, 1910, together with the deed of trust hereinbefore referred to, securing the same, $25,000.00 in cash, vendor's lien notes for $705,000.00 payable on or before ten years from date, with interest at the rate of three per cent. per annum, payable from the 20th day of August, 1910, semiannually, or within sixty days after such semiannual period, said notes to be executed by the said parties of the second part, to be payable to the order of the parties of the first part, and to be secured by a vendor's lien in said conveyance, and also by a deed of trust in the usual Texas form, with a power of sale conveying the said lands hereinbefore mentioned given by said party of the second part to the said party of the third part as trustee for said parties of the first part, it being agreed and understood that said purchase price is to be net and free from costs of surveys and from commissions, if any, incurred by the parties of the second part. The payment of a subscription of $25,000.00 of the preferred stock of the Texas Orchard Development Company, and a payment of a subscription of $1,375,000.00 of the common stock of the said company. And whereas, it is contemplated that the party of the second part shall subdivide said lands, and sell said subdivisions separately, and it is desired that provision be made for the release of such subdivision from the operation of said vendor's lien and deeds of trust, and in order to allow the redemption of the preferred stock of said party of the second part in accordance with its articles of incorporation, and in accordance with the terms of this agreement."

The agreements are as follows:

"The party of the fourth part is to pay said Houston Land and Trust Company the $55,000 lien held by it on said lands, with interest due thereon, and take an assignment of the same until another deed of trust on the same terms can be substituted which cover the land to be conveyed to the party of the second part, and shall be made and recorded as a first lien on said land to be conveyed to the said party of the second part, securing the payment of a note for $55,000.00 dated November 26, 1910, and due on or before three years from date thereof, with interest thereon."

The party of the fourth part agrees to release portions of the land as provided in the contract. Provides for a survey of the land and a credit on the vendor's lien note at the rate of $27 per acre in case the acreage shall be short of 30,000 acres.

"All taxes, charges and liens against said land are to be paid in full by the party of the first part up to August 20, 1910, excepting the notes amounting to $55,000.00 secured by a deed of trust which is now or may hereafter be held by the said party of the fourth part, and which shall be paid as herein provided."

Also provides for payment by Texas Orchard Development Company of drainage district taxes. Provides the method of making contracts of sale to purchasers of the land, and terms upon which deeds shall be executed and delivered. Provides that the vendor's lien notes given to the Rowan trustees shall be held by the trustee until paid, or until after default, when they shall be delivered to said Rowans, trustees. Provides that all moneys, less agents' commissions, received by the Texas Orchard Development Company shall be turned over weekly to the Southern Trust Company as trustee, and constitute the net proceeds of sales.

"Ten per cent. of said net proceeds held by the party of the third part on account of sales or contracts of sales of the land as provided in paragraph seven shall be held by the party of the third part to the amount of $125,000.00 as a sinking fund for the retirement of the preferred stock issued by the party of the second part, and may be disbursed for such purpose at such time and in such manner as the directors of said party of the second part shall determine, and as is provided in the articles of incorporation and in this agreement, and payment of said funds upon the order of said directors as above provided shall fully and completely end any responsibility of the party of the third part as to said funds, and it shall be under no obligation to see to the further disposition of the same."

"Until the said indebtedness of $55,000.00 held by the party of the fourth part and interest thereon shall be fully paid and satisfied, twenty-two and one-half per cent. of said net proceeds held by said party of the third part, as hereinbefore provided, shall be charged against said parties of the first part, and be forthwith applied to the said indebtedness held by the party of the fourth part as follows: First, to the payment of any interest upon the said indebtedness then due and unpaid; second, to the payment of the interest upon said indebtedness for the current semiannual period, and third, to the payment of the principal."

Until the said indebtedness of $55,000 held by the party of the fourth part and interest thereon shall have been fully paid and satisfied, 22½ per cent. of said net proceeds held by said party of the third part, as hereinbefore provided, shall be by the party of the third part forthwith credited upon the purchase-money notes given by the party of the second part to the parties of the first part, and paid over to the said parties of the first part. Said credit shall be applied, first, to the interest, if any, then due upon all of said notes not paid or canceled, and then to the principal of the said note or notes, it being hereby agreed and understood that the interest on said vendor's lien notes shall be payable semiannually, or within 60 days after such semiannual interest period. Provides that the remaining 45 per cent. of the net proceeds shall be turned over to the party of the third part by the Southern Trust Company, and that after the sinking fund to the amount of $125,000 for the redemption of said preferred stock has been provided for, the net proceeds shall be divided as follows: Twenty-five per cent., instead of 22½ per cent., as provided in paragraph 9, to cover the $55,000 indebtedness; 25 per cent. to pay interest and principal on said vendor's lien notes; 50 per cent. turned over to the Texas Orchard Development company, instead of 45 per cent., as above provided. And, further, that after said indebtedness of $55,000, and said sinking fund of $125,000 to redeem said preferred stock has been paid, thereafter 50 per cent. of the net proceeds shall be paid upon the vendor's lien notes, and 50 per cent. turned over to the Texas Orchard Development Company. Provides that all papers and documents shall be turned over to the Texas Orchard Development Company after payment of the indebtedness provided for. Provides for the advancement of certain moneys from the

funds of the company to make improvements under conditions which never happened. Provides for the division of the land into three classes for the purpose of providing for partial releases in case of sale. Provides for the execution of releases in favor of purchasers of said lands by the holders of the various incumbrances thereon—

"provided, however, that the releases herein mentioned shall not be executed unless and until the amounts received by the party of the third part as net proceeds of the sale of said lands so to be released shall amount to an average of $45.00 for each acre of land in class A released; an average of $35.00 for each acre in class B, and an average of $25.00 for each acre in class C, together with interest thereon at the rate of three per cent. per annum from the date of the conveyance by the parties of the first part to the party of the second part." [This was subsequently modified, as will be shown by supplemental agreement.]"

"It is also further agreed and understood by and between the parties hereto that the holders of the preferred stock or any of them after three years, and before five years, from the date of the issuing of the same, in the event that such shares are not redeemed in accordance with the provisions of the charter of said party of the second part, may turn over said preferred shares to the parties of the first part herein, together with three shares of common stock for one share of said preferred stock, and said parties of the first part in such case hereby agrees to convey to such holders of said preferred stock, or those of them making a request therefor, upon sixty days' notice, by warranty deed, free of all incumbrances, unimproved land of an average quality of the whole that may have been conveyed to said party of the second part by said parties of the first part, sufficient at $27.00 per acre to take up said preferred stock at par. It is hereby agreed that the said parties of the first part may purchase from the said party of the second part sufficient land at $27.00 per acre to redeem said preferred stock as hereinbefore provided, and to pay for the same by credits on said vendor's lien notes hereinbefore referred to, provided the same shall not have been paid, it being the intent of the parties hereto that no accumulated dividends shall attach to said preferred shares if redeemed in land by said parties of the first part as herein provided. In case the holders of said preferred stock desiring to exchange said stock for land, in accordance with the articles of incorporation of the parties of the second part, or in accordance with the terms of this contract, and the said party of the second part or the parties of the first part cannot agree with said holders of said preferred stock upon the selection of land to be used for said purpose, each of said parties shall select an umpire, who together shall make a final selection, and if the umpires thus appointed cannot agree they shall select a third, and a majority of the umpires thus appointed shall make a selection. Said parties of the first part, as is provided in this agreement, or as is provided in said article of incorporation, or said party of the second part, instead of deeding said land to said preferred stockholders, may pay said stockholders the par value of said preferred shares, together with the accumulated dividends thereon in money."

"It is also further agreed and understood that in the event the holders of the preferred stock of the party of the second part, or any of them, shall demand a redemption of their shares in accordance with the charter of said party of the second part, or the provisions of the foregoing paragraphs of this agreement and the said party of the second part or the said parties of the first part shall agree to convey to them lands in accordance with the provisions of the charter of the said party of the second part, or the provisions of the foregoing paragraphs of this agreement, then the party of the third part shall forthwith release said land thus agreed to be conveyed in the redemption of said stock from the lien upon the same provided for in the deed of trust securing said vendor's lien notes hereinbefore referred to given by said party of the second part to said parties of the first part."

It also provides that the agreement of August 20, 1910, shall remain in full force and effect until this contract is signed by all of the parties thereto, and that when so signed said contract of August 20, 1910, shall become null and void. (The contract was finally signed by all of the parties, as above stated, in April, 1911.) Provides that no agreement between the parties of the first part and second part, except as herein expressed, shall be binding upon the parties of the third and fourth part. Provides for the conveyance of said lands to a trustee in case the Texas Orchard Development Company cannot take title to said land, or is required to divest itself of title thereto. Provides for compensation of the Southern Trust Company as trustee. Makes the contract binding upon the parties, successors, and assigns of the parties of the first, second, and third part, and the heirs, executors, administrators, and assigns of the party of the fourth part.

On November 18, 1910, after the execution of the four-party agreement above summarized, the Texas Orchard Development Company, acting by its president and secretary, party of the first part, and the Rowan trustees before named, parties of the second part, executed an agreement in writing, reciting the execution of the former agreement, and that the said trustees, parties of the second part, are prepared to tender to the party of the first part a deed to the lands described in said agreements in accordance with the terms thereof. This agreement provides that the deed should be executed and placed in the hands of Mr. Beverly D. Harris, of Houston, Tex., to be by him turned over to the Texas Orchard Development Company upon payment to said Harris for the parties of the second part (the Rowans) of $25,000 in cash, the delivery of its certificate for $25,000 of the preferred stock of the Texas Orchard Development Company, vendor's lien notes, or a note to the amount of $705,000, secured by a deed of trust, all in accordance with the terms of said contract referred to, and the delivery to Edward M. Day, trustee, of Hartford, Conn., of the certificate for $1,375,000 of the common stock of said party of the first part—

"the same to be distributed by the said Edward M. Day, trustee, as follows: $190,000.00 to D. Noble Rowan, trustee; $190,000.00 to E. H. Kent; $190,000.00 to Edgar C. Linn; $380,000.00 to George E. Keeney; $300,000.00 to George E. Keeney; $75,000.00 to Archibald H. Rowan, and $50,000.00 to George E. Keeney to be turned over by him to the treasury of the Texas Orchard Development Company."

After the execution of this agreement, a deed was executed in accordance therewith, and placed with Mr. Harris, together with a deed of trust executed by the Texas Orchard Development Company to the Southern Trust Company as trustee. This trust deed conveys the lands conveyed to the orchard company by the Rowan trustees, and contains the recital that the notes mentioned in said deed of trust were given for the purchase money of the land, and in addition thereto the purchaser assumed the payment of the $55,000 prior incumbrance of the land. This trust deed also contains the following recital:

"It is also hereby agreed and understood that the said D. Noble Rowan, Archibald H. Rowan and George W. Rowan, trustees, as hereinbefore described, may purchase from the Texas Orchard Development Company land at $27 an acre, and to pay for the same by credits on the vendor's lien promissory notes hereinbefore referred to to carry out the conditions and terms of the agreement found in clause 16 of said four-party agreement hereinbefore referred to."

It concludes with the usual provisions as to the power of sale on the part of the trustee. There was also sent to Mr. Harris the abstract of the property, and George E. Keeney sent along with these papers, and deposited in escrow with Mr. Harris, about $60,000 to take up the $55,000 notes and interest held by the Houston Land & Trust Company. The money was used for that purpose, but the excess over $55,000, deposited by Keeney for that purpose, was repaid to him, so that the amount actually advanced by him for this purpose was only $55,000. Having theretofore advanced to D. Noble Rowan $2,000 of the $25,000 cash consideration for the purchase of the land, the defendant Keeney sent to Mr. Harris and deposited in escrow with him an additional $23,000. The entire $25,000 thus advanced by him was treated as a payment of $25,000 on his subscription to the preferred stock of the company. The remaining $23,000 of the cash consideration of $25,000 was paid to the Rowans, but on account of objections raised to some of the papers, they were not delivered in the form as prepared, but were modified and new instruments drawn in lieu thereof, which were finally executed about the 18th of April, 1911. In April, 1911, defendant George E. Keeney executed a written instrument, reciting that he was the owner of the notes evidencing the $55,000 indebtedness to the Houston Land & Trust Company, and that, "for and in consideration of one dollar, and other valuable considerations to me in hand paid by D. Noble Rowan, trustee," extended the time of maturity of the notes to November 26, 1913. Said instrument contains this clause:

"But this instrument is executed for no other purpose than to extend the time for the payment of said notes, as above provided."

There was a subsequent agreement executed by the parties to the four-party agreement, which explained and modified some of its terms, but none of the modifications are material to the decision of the questions presented by this appeal.

The following from the testimony of the defendant George E. Keeney shows the manner in which the preferred and common stock was issued:

"There was $125,000 of the preferred stock. I got 1,000 shares and paid in par for every dollar of it, and that was every share of stock that I received from the company at the time of its organization. The other $25,000 stock was issued to Mr. Archibald H. Rowan, and allowed as a credit on the purchase of the land. Mr. Kent received his 1,900 shares of common stock for the reasons stated in the second supplement of the four-party agreement. It might be well to refer to that. I suppose it was for promotion purposes. He never paid any actual value to the company. Mr. Linn's 1,900 shares were paid for in the same way. Mr. D. Noble Rowan's stock was put in the same way. The arrangement was that every share of preferred stock that was taken and paid for should receive three shares of common stock from the Rowans, and I was given the same as they and others received for promotion purposes. I received from them 6,800 shares of stock under that arrangement. I paid for that stock in the way stated in the contract. I paid no cash for it."

The preferred stock certificates contain the provisions for their redemption set out in the agreement before quoted. The amounts paid for the preferred shares of stock was the only cash capital of the company, and all of this, with the exception of the portion used to make the cash payment to the Rowans, was expended in the improvements and development of the lands by grading, ditching, and building roads and planting some of the lands in orange and other citrus fruit trees. The company made sales of the land. Up to March 16, 1912, it had sold, or contracted to sell, 2,280 acres of unimproved land at an average of $55.50 per acre, and had collected $59,251.66 of the purchase price. It had also sold 175 acres of the improved lands (that is, lands planted in fruit trees) at an average price of $327.45 per acre, and had collected on said sales the sum of $12,216.40. These improved lands were sold under contracts which required a considerable expenditure by the company in their further development. There had also been sold 26 town lots at an average price of $187.30 per lot, and $1,152.50 collected from these sales.

The Southern Trust Company refused to make deeds and execute releases unless the lands were sold at such price that 22½ per cent. thereof would be sufficient to make the payment to the Rowans in accordance with the terms of the agreement between the parties, and as such price could not be obtained, sales of the lands ceased, and the company was without funds to meet its obligations. This was the condition when the receiver was appointed. The value of the

lands as a whole has never been greater than $27 per acre.

No question is made as to the correctness of the trial court's findings as to the amounts due the plaintiffs, interveners, and defendants, except as to some of the amounts found to be due defendant Keeney. The facts upon this issue will be hereinafter stated.

The decree, in addition to establishing the claims of the various parties and ordering the sale of the land and application of the proceeds as before stated, further provided that the Rowans, trustees, if they so desired, should have the right to redeem the preferred stock at any time prior to November 26, 1913, by conveying to the owners of said stock a sufficient amount of the unimproved lands of average quality and free of all incumbrance at $27 per acre to redeem said stock at par and accrued interest, in accordance with the terms of the agreement before cited.

[1] Under appropriate assignments of error the appellants assail the judgment on the ground that the provisions in the contract between the parties and in the charter of the orchard company for the redemption of the preferred stock are against public policy, illegal, and void, and that the Rowans, trustees, in entering into said contract, exceeded the powers conferred upon them by the trust deed under which they assumed to act. The first proposition under these assignments is as follows:

"An agreement by a corporation to repay out of its assets, without reference to whether or not there are net profits sufficient therefor, to a subscriber for stock the amount paid by such stockholder for his stock, is against public policy, both under the laws of Texas and of Connecticut, and no court of equity can properly give affirmative relief to a party seeking the enforcement of such agreement."

It may be conceded that this proposition embodies a sound principle of law, but we cannot think it is applicable in this case. As a general rule, the rights of a preferred stockholder are not those of a creditor of the corporation. His rights are only superior to those of a general stockholder of common stock, in that he is entitled to have his dividends paid before any dividends are paid on the common stock. He is not entitled to any dividends until the corporation has funds applicable to the payment of dividends, and an agreement to pay dividends out of the capital, if there are no profits, will not be enforced. In Cook on Corporations (7th Ed.) vol. 1, § 271, it is said:

"A subscriber for preferred stock cannot rescind the subscription on the ground that the stock contains a provision that the company shall buy it back at a certain time at par and interest. Such a provision is invalid, but does not invalidate the stock itself. An agreement of a corporation to pay the preferred stockholders before corporate creditors are paid is void. A preferred stockholder to whom the corporation offers bonds for stock which he declines cannot accept after the company becomes insolvent. Occasionally a mortgage is given by the corporation to secure the dividends on preferred stock, and to give it preference in payment over subsequent debts of the corporation upon insolvency or dissolution. It is difficult to see how such a mortgage would be legal unless it had been issued under express statutory authority. The courts have no power to give the stockholders a preference over creditors, even though the preferred stock is, by its terms, to be a lien on the property. A mortgage given to repay to preferred stockholders the amount they have invested in their stock, as well as to secure regular creditors of the company, is invalid altogether."

The rule that a corporation cannot make a valid contract by which it agrees to pay dividends upon its preferred stock, regardless of whether there is any property out of which to make such payment, and redeem said stock at par and accrued interest out of the capital of the corporation in event of default in the payment of dividends, has been generally recognized and enforced by the courts. The reason of the rule and the necessity for its enforcement are stated with much clearness and force in the case of Lockhart v. Van Alstyne, 31 Mich. 76, 18 Am. Rep. 156, and with equal force and clearness by Chief Justice James of our Court of Civil Appeals for the Fourth District in the case of Reagan Bale Co. v. Heuermann, 149 S. W. 228. In the Reagan Case the court say:

"If a corporation, organized under the laws of Texas, has the right and authority to sell its shares to any of its stockholders and bind itself, if there should be default in payment of dividends, to take the capital of the corporation and pay the shareholders not only the amount paid in, but a high rate of interest thereon, one of two things would be the inevitable result; that is, the corporation would be so hampered at its very outset that it could not obtain credit, or, if it did obtain it, the creditors would be absolutely at the mercy of the stockholders. There is nothing in the laws of Texas that gives any authority to any corporation to create a privileged class among its stockholders, or to place it in their hands by a mere notice to change their attitude towards the corporation from that of a stockholder to that of a highly protected creditor. Our laws contemplate that those who buy the stock in corporations assume the risks and hazards of the venture in which the corporation has embarked, and that creditors can deal with the corporation with the assurance that the men constituting it cannot absorb the capital of the concern and leave them without security. The right to have precedence over creditors in this case is not based upon any statute of Texas, nor upon any decision of this or any other state. On the other hand, we have seen no decision that sustains the claim that without statutory authority, without any necessity being shown * * * to prefer stockholders over ordinary creditors, a corporation has any such power."

[2-4] If appellees' rights to redemption of their preferred stock depended only upon an agreement of the corporation to redeem the stock at par and accrued interest out of its capital or assets, to the prejudice of the rights of creditors and other stockholders, we would be compelled to hold that such agreement was enenforceable, but appellees' rights are not dependent upon such an agreement. In the first place, the land out of which this redemption is to be made is no part of the capital of the corporation. The business of the corporation as expressed in its charter was buying, improving, and selling lands, and

it was organized for the express purpose of taking over, improving, and selling the lands involved in this suit. The only actual capital it ever had was the money paid to it by the purchasers of the preferred stock. If the land had been of value in excess of the incumbrances thereon, such excess would have been an asset of the corporation, but the evidence sustains the finding of the trial court that the land had never been of greater value than the amount which the corporation agreed to pay therefor. When the corporation took this land, it took it charged with the obligations of the Rowan trustees to redeem out of the proceeds of sales of the land made by the corporation, or out of the land itself the preferred stock subscribed and paid for by appellees, and it cannot be relieved of this charge upon the ground that a corporation is not authorized to redeem its preferred stock out of its capital or assets at the expense of its creditors and other stockholders. The application of the general rule embodied in appellants' proposition to the facts of this case is not necessary to the protection of the rights of the corporation, or any of its stockholders or creditors, and would enable the Rowans, after having received the benefit of the money paid by the purchasers of the preferred stock, to repudiate their obligation to reimburse such purchasers. To permit this to be done would certainly be against equity and good conscience, and there is no inexorable rule of law, founded upon constitutional provisions, statute, or public policy, which stays the hand of equity and denies relief to the appellees. The agreement of a corporation to purchase its stock from one of its stockholders when such purchase can be made and the stock paid for without prejudice to the rights of creditors and other stockholders is a valid and enforceable agreement. Howe Grain Co. v. Jones, 21 Tex. Civ. App. 198, 51 S. W. 24; San Antonio Hardware Co. v. Sanger, 151 S. W. 1104. A corporation organized for the purpose of selling land which represents the capital of the corporation, and for which the stock of the corporation was issued, may provide in its charter that the holders of the stock may surrender it and accept land in lieu thereof upon such terms as may be determined by the corporation. This was expressly decided by our Supreme Court in the cases of Franco Texas Land Co. v. Bousselet, 70 Tex. 442, 7 S. W. 761.

[5] We are also of opinion that the contention of appellants that the agreement by the Rowans, trustees, for the redemption of the preferred stock of the corporation, is unenforceable because the trustees had no authority under the deed of trust under which they acted to make such agreement cannot be sustained. The deed of trust, which we have before set out, gives to the trustees—

"full power to manage said land or estate, to improve, lease or sell the whole or any part thereof upon such terms and conditions as may seem best to said trustees or acting trustees, and also with full power to organize a corporation under the laws of such state of the United States of America or other country as such trustees or the acting trustees may deem best and convey said estate thereto."

The authority to organize a corporation for the purpose of developing and selling the land and in furtherance of this purpose to convey the estate to such corporation carried with it the power to make all agreements necessary and proper to effect the organization of a corporation for the purpose stated, and the undisputed evidence shows that it was necessary to make the agreement for the redemption of the stock in order to effect the organization of the corporation. When the agreement is considered as a whole and in the light of the circumstances attending its execution, as shown by the undisputed evidence, it must be held that the trustees in entering into the agreement were in good faith exercising the discretionary powers vested in them by the trust deed. The power to manage, improve, and sell the land, or any portion thereof, and to invest and apply the proceeds as directed in the trust deed being expressly conferred, and there being no directions as to how the improvement and sale of the land was to be accomplished, the method or means to be employed was left to the discretion of the trustees. In order to obtain the necessary funds for the improvement of the land and its advertisement and sale by the corporation, the trustees in effect agreed with appellees that, if they would advance the money necessary for this purpose and take stock of the corporation therefor, the trustees would, if the appellees within a designated time desired to dispose of said stock, exchange land therefor at the price of $27 per acre. We think the power to make this agreement is necessarily implied from the power expressly conferred by the trust deed. Perry on Trusts, par. 473 et seq.; 39 Cyc. 207, 208, 209, 211, 290.

[6] In addition to this, the evidence shows that with a knowledge of the agreement all of the appellants, the beneficiaries in said trust deed, accepted substantial benefits under the agreement in question, and they are therefore estopped to claim the agreement was unauthorized.

[7] We do not think the trial court erred in refusing to hold that appellants were entitled to declare a forfeiture of the executory contract for the sale of the land because of default in the payment of the purchase money by the corporation, and to recover the title and possession of the property. The right of a vendor of land who has reserved in his deed of conveyance a vendor's lien to secure the payment of the purchase money to declare a forfeiture upon default in the payment of the purchase money and recover the land is not an absolute right; and, where rights and equities are shown in the vendee or in third parties which can only be protected by restricting the vendor to his remedy of

foreclosure of his lien, the court should confine him to that remedy. We think the facts of this case justified the trial court in refusing to allow appellants to recover the land.

[8] The proposition that appellants were entitled to rescind the deed because of fraud and illegalities which entered into and affected the entire transaction and agreement between the parties cannot be sustained. He who seeks equity must do equity,' and appellants, having received benefits under the agreement and contract, cannot rescind the contract for the conveyance of the land without offering to return to appellees that which they received from them. The rule in suits for rescission of contracts for sale of land is stated by our Supreme Court in the case of State v. Snyder, 66 Tex. 698, 18 S. W. 106, as follows: ·

"The rule, at least as to litigation between man and man, which governs in courts of equity, is perhaps nowhere more fully and correctly stated than by Mr. Pomeroy, who says: 'It may be regarded as an universal rule, governing the court of equity in the administration of its remedies, that whatever may be the nature of the relief sought by the plaintiff, the equitable rights of the defendant growing out of, or intimately connected with, the subject of the controversy in question will be protected; and for this purpose the plaintiff will be required, as a condition to his obtaining the relief which he asks, to acknowledge, admit, provide for, secure, or allow whatever equitable rights, if any, the defendant may have, and to that end the court will, by its affirmative decree, award to the defendant whatever reliefs may be necessary in order to protect and enforce these rights.' Pom. Eq., § 388."

[9] Appellants also complain of the judgment in favor of defendant Keeney, awarding him $4,072.29, amount of taxes paid by him on the land, and $6,136.70, advanced by him to pay interest due by the orchard company upon the vendor's lien notes held by the trustees, and establishing and foreclosing a first lien upon the land to secure the payment of these amounts. The original deed of trust given to secure the $55,000 indebtedness provided that if the grantors failed to pay the taxes on the land, the holder of the indebtedness could pay same, and the amount so paid should be a charge upon the land. The evidence shows that the defendant Keeney, the holder of the indebtedness, paid $3,554 taxes on the land, which, with interest thereon up to the date of the judgment, amounted to the sum of $4,072.29.

The evidence also shows, and the trial court finds, that the Rowans by cash paid the orchard company and by credits allowed on interest due on their vendor's lien notes accounted to or paid said company all of the taxes due by them on said land. It goes without saying that this was not a payment to the defendant Keeney, and does not affect his right to recover from the appellants the amount due him for the taxes paid by him and to foreclose the lien given under the deed of trust to secure the repayment to him of said amount.

[10] The undisputed evidence further shows that the defendant Keeney advanced the sum of $6,136.40 to pay interest on the vendor's lien notes due by the orchard company to appellants, and said amount was paid to appellants. The contention is that this advancement was a loan to the company, and is not a debt due by appellants, and said defendant has no lien upon the land, to secure the repayment of said sum, superior to the vendor's lien held by appellants. The last of the numerous agreements executed by the parties contains the following provision:

"It is now agreed that the funds created to discharge the vendor's lien notes of seven hundred and five thousand ($705,000) dollars and the accrued interest thereon shall be applied to payment of any of the semiannual installments of interest accrued, whether collected before or after the accrual of same, and if any installment of interest be paid out of other funds or to be advanced by other parties, collections thereafter made for the benefit of said fund shall be applied, when realized on, to repay said advancement of loan so made out of other funds (or) by other parties."

While the express terms of this provision only fixes a charge upon the funds provided in the several agreements to be set aside to pay the vendor's lien notes out of money received from the sale of the lands by the corporation, it clearly evidences an intention on the part of appellants that, if any of the parties advanced money to pay interest on the vendor's lien notes, he should be repaid out of the proceeds of the sale of the land before payment should be made on said notes. The corporation being no longer a going concern, and it being necessary for the court to order the sale of the land for the purpose of paying the vendor's lien notes and other lien indebtedness, we think it could, in its judgment and order of sale, give effect to the clear intention of the parties by providing that the proceeds of such sale should be applied in accordance with such intention, and this is what the judgment does in directing that defendant Keeney have a first lien on said proceeds to secure the repayment of the amount advanced by him to pay the interest due appellants on said vendor's lien notes.

[11] Appellants further contend that the judgment is invalid because, if any valid right of redemption of the preferred stock is conferred by the agreements of the parties, such right had not accrued at the time this suit was brought, nor at the time judgment herein was rendered, and because appellants were not bound, under said agreements, to redeem appellees' preferred stock in money. We do not think this contention can be sustained. The corporation is insolvent; and, it being necessary, in winding up its affairs, to order the sale of the land to satisfy the claims of appellants and the lienholders, the court was authorized to adjust the equities of all the parties. Appellants having obtained a foreclosure of their lien and an order of sale to satisfy the indebtedness due them, it was necessary, in

order to protect the holders of the preferred stock in event the land should not be purchased by appellants, to provide, either that the proceeds of the sale should be applied to the redemption of this stock, or that the land should be sold subject to the right of appellees to have the stock redeemed out of said land, in accordance with the agreements between the parties. The decree gives to appellants the option to redeem the stock in land; and, if they become the purchasers at the sale, they may exercise that option. This judgment can work no injustice to appellants, and its validity is not affected by the fact that at the time it was rendered the right of appellees to have their stock redeemed in land would not have accrued under the agreements if the corporation had continued a going concern.

What has been said disposes of the material questions presented by appellants' brief. While we have not discussed the various assignments in detail, all of them have been considered, and none of them should, in our opinion, be sustained.

[12, 13] Under appropriate assignments presented by appellees Gordon and Keeney in their cross-appeal, complaint is made of the judgment awarded the receiver against them on their unpaid subscription to the common stock of the corporation for an amount sufficient to pay the unsecured creditors. The evidence sustains the finding of the trial court that the common stock held by appellees was issued without any money or thing of value having been received therefor by the corporation. Such being the facts, the holders of this stock who had paid nothing therefor are liable to the creditors of the corporation, who in dealing with it had a right to assume that the stock issued had been issued for value as required by the Constitution and laws of this state. Section 6, art. 12, Texas Constitution; articles 1146, 1198, Revised Statutes 1911; O'Bear-Nester Glass Co. v. Antiexplo Co., 101 Tex. 431, 108 S. W. 967, 109 S. W. 931, 16 L. R. A. (N. S.) 520, 130 Am. St. Rep. 865. We think, however, that this portion of the judgment is erroneous in adjudging that plaintiff and defendant Keeney should pay the whole amount necessary to satisfy the indebtedness of the corporation to the unsecured creditors. The undisputed evidence shows that appellants D. Noble Rowan and Archibald H. Rowan, trustees, received $190,000 of stock for which nothing was paid, and they should be held liable on the stock issued to them for their proportionate part of the debts of the unsecured creditors.

The remaining assignments presented by appellees are without merit and are overruled without discussion.

We think the judgment of the trial court should be reformed as above indicated, and as so reformed should be affirmed; and it has been so ordered.

Reformed and affirmed.

### On Motion for Rehearing.

Appellants Rowan in their motion for rehearing insist that we erred in our main opinion in holding that the agreement by which the Rowans and the Texas Orchard Development Company bound themselves to redeem the preferred stock sold to appellees at par and accrued interest at the rate of 7 per cent. per annum either in cash or in land, to be taken out of the body of land conveyed by the Rowans to the orchard company at the price of $27 per acre, was not illegal and unenforceable. We do not care to add anything to what is said in our former opinion in support of our holding that the agreement is not void and should be enforced. Counsel for appellants argue with great force that the statement in our former opinion that the land out of which this stock is to be redeemed is no part of the capital of the corporation is unsound. It may be that if construed literally the statement is inaccurate, but our holding that the agreement is not void does not depend upon the accuracy of this statement. The agreement with appellees to give them land at $27 per acre for the amount invested by them in preferred stock of the corporation, with interest at 7 per cent. per annum, was made prior to the formation of the corporation, and when the land was deeded to the corporation it was charged with this contract; and, the corporation, having taken the title to the land with knowledge of the contract, and having expressly agreed to be bound thereby, cannot defeat the enforcement of the contract on the ground that it is against public policy for a corporation to redeem its stock out of its capital. It is true that a portion of the money received by the corporation for the preferred stock sold to appellees was paid to the Rowans as part of the purchase money of the land, and the land purchased with this money would ordinarily have become a part of the capital of the corporation, but this fact would not relieve the land of the charge which the contract had placed upon it prior to its purchase by the corporation, and to the extent of this charge the land could not, in any true sense, be regarded as capital or asset of the corporation.

Complaint is also made in the motion of our finding in the main opinion that Rowans, appellants, accepted benefits under this contract with knowledge of its terms. A further examination of the record discloses that this finding is too broad. The appellants Misses Alice, Margaret, and Jennie, Rowan, who were beneficiaries under the deed of trust by which the property was conveyed to D. Noble and Archibald H. Rowan, did receive a portion of the money paid by appellees for the preferred stock, but it is not shown that at the time they received this money they knew it was a part of the money paid by appellee for the preferred stock under the agreement to redeem before mentioned

tioned. We are still of opinion that the contract of the Rowan trustees to redeem the stock in land at the rate of $27 per acre was one which they were authorized to make under the powers conferred upon them by the trust deed.

After careful consideration, we have reached the conclusion that the motion for rehearing should be overruled, and it has been so ordered.